## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETTS

MICHAEL W. RUMSEY,

      *Plaintiff*,

    v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      *Defendant*.

Case No. 1:24-cv-12187

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiff Michael Rumsey and over 200 similarly situated workers laid off by IBM submitted their federal age discrimination claims for unlawful termination to final and binding arbitration. But Defendant IBM is opposing their requests for arbitration based on its reading of its convoluted arbitration agreement to impose a 300-day deadline for filing arbitration demands. That rigid deadline, however, directly conflicts with and unlawfully waives the flexible and potentially much longer statute of limitations set by Congress in the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634.

2.      The ADEA was amended in 1991 to change a more conventional fixed deadline for bringing a "civil action" to "90 days **after** the date of receipt" by the person aggrieved of a notice of right to sue from the federal Equal Employment Opportunity Commission (EEOC) stating that the agency has terminated its pre-suit, administrative proceedings. 29 U.S.C. § 626(e) (emphasis added). This unusually adaptable statute of limitations shows that Congress

1

determined that a statute of limitations tailored to the completion of the EEOC process "was required to allow [employees] to effectuate their private cause of action" under the ADEA and thus is an unwaivable substantive statutory right. *Anderson v. Comcast Corp.*, 500 F.3d 66, 77 (1st Cir. 2007) (holding that a four-year statute of limitations in a consumer rights statute "was not waivable" in an arbitration agreement and thus its one-year filing deadline was invalid).

3.      Yet, IBM purports to enforce a deadline that would have required Mr. Rumsey to file an arbitration demand more than four years **before** the EEOC completed its proceedings that resulted in a determination that IBM had inflicted a systemic, nationwide scheme of age discrimination on him and thousands of other older employees. In short, the 300-day deadline in IBM's separation agreement with Mr. Rumsey is invalid under the ADEA because it is "incompatible with his statutory rights" to benefit from the EEOC's investigation, determination, and conciliation proceedings before deciding whether to bring a civil action. *Anderson,* 500 F.3d at 77 (1st Cir.).

4.      From 2013 until at least 2018, IBM laid off tens of thousands of older workers in what the EEOC found to be a nationwide, systematic, "top-down" scheme devised by IBM's "highest ranks" to replace its older workers with younger workers in violation of the ADEA. In the EEOC's September 2020 Determination, attached as Exhibit (Ex.) 1, it concluded that IBM's explanation for its layoff decisions did "not withstand scrutiny."

5.      The EEOC's 2020 finding of systemic age discrimination by IBM was reinforced by direct evidence that became public in February 2022. These internal IBM emails showed its top leaders discussing the "need to hire early professionals" to keep up with competitors with a larger share of millennial employees and to make "the progress we need to make demo-

graphically." In these same emails, senior officials planned for making their older employees an "extinct species," while denigrating them as "dinobabies" and a "dated maternal workforce."

6.    To further cover up the adverse impact of its massive layoffs on older workers and insulate its actions from legal challenge, in 2014 IBM ended its longstanding practice, dating back to at least 2001, of providing employees age 40 or older who were chosen for layoffs with comparator information that would reveal if older workers were being disproportionately selected for termination. The disclosure of this comparator information—the ages and job titles of other employees in the affected job units and whether they were chosen for layoff—is required by the Older Workers Benefit Protection Act (OWBPA) amendments to the ADEA as a prerequisite for obtaining a valid release of any right or claim under the ADEA. The OWBPA prohibits altogether the prospective waiver of any right under the ADEA and imposes strict requirements for waiver of any existing right under the ADEA, with heightened protections for employees laid off as a group. 29 U.S.C. § 626(f).

7.    To avoid having to provide the comparator information required by the OWBPA, IBM made a tactical decision to exclude ADEA claims from the scope of the release in its separation agreements. But, in an attempt to still avoid legal accountability for its scheme of disguising age discrimination through mass waves of layoffs, it included a provision in the separation agreement requiring laid-off workers to bring their age discrimination claims individually in arbitration, rather than as a collective action in court.

8.    Now, IBM is trying to prevent its laid-off workers from bringing their claims even in individual arbitration, arguing that because they took advantage of the EEOC investigation and conciliation process, as was their right under the ADEA, their claims are time-barred in arbitration.

9.     Michael Rumsey was laid off from IBM on May 31, 2016, as part of IBM's systematic mass layoffs of older workers. In July 2016, Mr. Rumsey filed a timely charge of discrimination with the EEOC.

10.     The EEOC conducted a lengthy and in-depth investigation of the complaints of Mr. Rumsey and 61 other older IBM employees who were terminated in group layoffs. In September 2020, it concluded its investigation with a determination "that there is reasonable cause to believe that [IBM] has discriminated against Charging Parties and others on account of their age."

11.     The EEOC's determination cited the data collected and analyzed in its investigation showing that IBM's layoffs between 2013 and 2018 "had an adverse impact" on older employees and that IBM targeted "primarily older workers (85.85%) in the total potential pool of those considered for layoff." The supporting evidence also included "corroborating testimony from dozens of witnesses nationwide."

12.     After its determination, the EEOC then engaged in its statutorily mandated conciliation efforts with IBM that resulted in a voluntary resolution between the EEOC and IBM. The EEOC's conciliation process also included efforts to reach a voluntary resolution of the damage claims of the Charging Parties, including Mr. Rumsey, and some Charging Parties did reach a voluntary resolution with IBM during the EEOC's conciliation process.

13.     But Mr. Rumsey was unable to secure an acceptable conciliation agreement. Thus, the EEOC issued a notice of right to sue (Conciliation Failure) to Mr. Rumsey on August 27, 2021, and within 90 days of that notice, on November 23, 2021, he filed an individual arbitration demand with IBM.

14.     Even though Mr. Rumsey met all the statutory prerequisites for filing his ADEA claims in court, and even though Mr. Rumsey's claims would undisputedly have been timely had he been able to file them in court, IBM contends that his claims are time-barred under its arbitration agreement. IBM has repeatedly claimed, including in numerous filings with courts and arbitrators, that a much shorter 300-day deadline purportedly provided in its separation agreement trumps the statute of limitations for filing "a civil action" under the ADEA—90 days after the EEOC issues a notice of right to sue—and thereby nullifies the statutory 90-day notice of right to sue issued by the EEOC.

15.     IBM's position is based on language in its separation agreement with Mr. Rumsey that it interprets to impose a maximum 300-day deadline to file an arbitration demand with IBM after receiving notice of termination. Thus, IBM contends that Mr. Rumsey's deadline for filing his ADEA claims in arbitration expired in December 2016, almost five years before the November 2021 statutory deadline under the ADEA for filing those claims.

16.     Mr. Rumsey files this action seeking a declaration that IBM's alleged 300-day deadline in its Separation Agreement is an invalid waiver of the ADEA's statutorily mandated limitations period, its absolute prohibition of the prospective waiver of any right under the ADEA, and its strict requirements for waiver of any existing right under the ADEA, with heightened protections for employees laid off as a group. In other words, IBM cannot enforce its interpretation of the deadline in the agreement because that would impermissibly waive Mr. Rumsey's statutory rights under the ADEA, both (1) to have the benefits of completed EEOC investigation, determination, and conciliation efforts before having to bring suit and (2) to seek relief for IBM's age discrimination.

17.    The ADEA, as enacted in 1967, contained a statute of limitations for claims against private employers of "two years or, for willful violations, three years." *Lavery v. Marsh*, 918 F.2d 1022, 1024 (1st Cir. 1990) (citing the then-current version of 29 U.S.C. § 626(e)(1)).

18.    But, in 1991, Congress amended the ADEA's limitations period to ensure that the deadline for bringing a "civil action" does not expire until "90 days **after** the date of receipt" by the person aggrieved of a notice from the EEOC that it has terminated its proceedings. 29 U.S.C. § 626(e) (emphasis added); *see also* Civil Rights Act of 1991, SEC. 115. Notice Of Limitations Period Under The Age Discrimination In Employment Act Of 1967, Pub. L. No. 102–166, Title I, § 115, 105 Stat. 1079.

19.    Thus, the text of the ADEA, as amended in 1991, could not be clearer that aggrieved persons are not required to bring a civil action until "90 days **after**" the EEOC officially completes its proceeding—including any investigation and conciliation efforts—and issues a notice of right to sue. This amendment to the ADEA, which tailors its statute of limitations to the completion of the crucial pre-suit role of the EEOC, shows that Congress did not intend to allow the limitations period in the ADEA to be shortened by contract to prevent an aggrieved employee from benefiting from the full EEOC process.

20.    IBM's attempt to use its separation agreement to straight-jacket the ADEA's flexible statute of limitations tailored to the completion of the EEOC process is an invalid waiver of Mr. Rumsey's rights under the ADEA for three primary reasons.

21.    **First**, and most importantly, IBM's alleged 300-day deadline prevents Mr. Rumsey and thousands of other laid-off workers from effectively vindicating their statutory rights to meaningfully participate in and benefit from the statutorily required EEOC investigation, determination, and conciliation processes **before** they must bring their claims

under the ADEA. In other words, IBM's filing deadline is "incompatible with his statutory rights" under the ADEA, rendering it unenforceable under First Circuit case law. *Anderson,* 500 F.3d at 77.

22.    **Second**, IBM's purported 300-day deadline—with no tolling or extension allowed for workers to participate in the EEOC's investigation and conciliation process—effectively deters aggrieved persons from filing charges with the EEOC or cooperating with its investigation and conciliation procedures. Thus, under binding First Circuit precedent, IBM's 300-day deadline is unenforceable because it "materially interferes with communication between an employee and the EEOC" and unlawfully impairs "the Commission's ability to investigate charges of systemic discrimination." *EEOC v. Astra U.S.A., Inc*., 94 F.3d 738, 744 (1st Cir. 1996) (quoting *EEOC v. Shell Oil Co*., 466 U.S. 54, 69 (1984)).

23.    **Third**, IBM's supposed 300-day deadline violates the requirements of the OWBPA for the waiver of "any rights" under the ADEA. This contractual deadline is invalid because (a) it seeks to limit the right of Mr. Rumsey and other laid-off workers to have the benefit of a future investigation, determination, and conciliation process by the EEOC before they must bring a civil action under the ADEA and thus violates the absolute prohibition in the OWBPA on the waiver of "rights or claims that may arise after the date the waiver is executed," 29 U.S.C § 626(f)(1)(C); and (b) it violates other minimum requirements in the OWBPA for a valid waiver including that it be part of an agreement "that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate," 29 U.S.C § 626(f)(1)(C), and that it provide comparator information about the other employees chosen and not chosen for a group layoff, 29 U.S.C § 626(f)(1)(A).

24.     IBM erroneously argues that its alleged 300-day deadline does not prevent employees from effectively vindicating their rights under the ADEA because IBM's deadline for filing an arbitration demand seeking damages under the ADEA is the same deadline provided by the ADEA itself for filing a charge of age discrimination with the EEOC. IBM's Mem. in Supp. of Mot. to Dismiss (Doc No. 15) at 18.[1]

25.     That argument rests on a false premise long ago rejected by the Supreme Court: "[A] charge of employment discrimination is **not** the equivalent of a complaint initiating a lawsuit." *EEOC. v. Shell Oil Co.*, 466 U.S. at 68 (emphasis added). Instead, the function of an EEOC charge "is to place the EEOC on notice" so it can "then undertake[] an investigation into the complainant's allegations of discrimination." *Id*; *see also EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 455 (6th Cir. 1999) ("By filing a charge, an individual does not file a complaint seeking relief, but merely informs the EEOC of possible discrimination.").

26.     IBM also repeatedly defends its claim of a 300-day deadline for demanding arbitration on the ground that the Supreme Court and other courts have repeatedly rejected efforts "to preclude arbitration" by challenging specific rules in an arbitration agreement. IBM's Mem. in Supp. of  Mot. to Dismiss (Doc No. 15) at 15, 18. But here Mr. Rumsey is seeking to move ahead with arbitration and it is IBM that is trying "to preclude arbitration."

## PARTIES

27.     Plaintiff Michael Rumsey is a citizen of the United States and a resident of Braintree, Massachusetts.

---

[1] Plaintiff cites to IBM's memorandum in support of its motion to dismiss the original complaint, even though that motion is automatically mooted by the filing of this First Amended Complaint, because the Federal Advisory Committee on Civil Rules recommends the filing of an amended complaint "to meet the arguments in the motion" to dismiss the original complaint. *See* Plaintiff's Unopposed Motion for Extensions of Time (Doc No. 19) at ¶¶ 4-5.

28.     Defendant IBM is a New York corporation with a principal place of business in Armonk, New York. It maintains offices in Massachusetts, including an office in Cambridge Massachusetts where Mr. Rumsey was employed.

29.     IBM provides technology services and equipment, including computing, cloud services, software, hardware, and analytics, to customers around the world. IBM employs about 300,000 people worldwide and ranks number 63 on the Fortune 500 rankings of the largest U.S. corporations by total revenue.

**JURISDICTION AND VENUE**

30.     This Court has subject-matter jurisdiction arising under 28 U.S.C. § 1332 (diversity) because the parties are citizens of different states and the value of the matter in controversy exceeds $75,000 and Plaintiff seeks declaratory and injunctive relief.

31.     The value of the matter in controversy exceeds $75,000 because Plaintiff has claims under the ADEA for damages against IBM totaling over $1,100,000, plus interest and attorney's fees and costs, and, if this Court enters judgment in Plaintiff's favor, he will be able to pursue those claims to judgment. If, on the other hand, the Court enters judgment against Plaintiff, his claims are likely to be time-barred.

32.     This court has personal jurisdiction over IBM because IBM transacts business in Massachusetts, including operating offices and employing hundreds of people there.

33.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiff have occurred in Massachusetts, including the termination of his employment by IBM and the signing of the separation agreement at issue in this action.

34.     And the issue of the validity of the 300-day deadline in IBM's Separation

Agreement is clearly for a court and not an arbitrator to decide because that Agreement explicitly states that "[a]ny issue concerning the validity or enforceability of this Agreement . . . shall be decided only by a court of competent jurisdiction." Ex. 2 at 3.

## FACTUAL ALLEGATIONS

**I.      Mr. Rumsey Was One of Thousands of Older Workers Who Was Laid Off by IBM and Signed a Non-Negotiable Separation Agreement with a Binding Arbitration Provision.**

35.      Plaintiff Michael W. Rumsey worked at IBM until May 2016 when, at age 52, he was suddenly terminated, ostensibly as part of a "Resource Action," which is IBM's term for a group reduction in force.

36.      But, as the EEOC later found, the Resource Action was actually part of an effort to "significantly reduce the headcount of older workers to make room for Early Professional Hires."

37.      When Mr. Rumsey was laid off, he was presented with a packet that contained a non-negotiable document called a "Resource Action Separation Agreement" with an attachment titled "Arbitration Procedure and Collective Action Waiver" that mandates that ADEA claims be brought individually in arbitration. The entire Separation Agreement is attached as Ex. 2.

38.      In exchange for a payment equal to one month's salary and three months of continued health and life insurance benefits, the Separation Agreement required Mr. Rumsey to waive all claims he may have against IBM, except for any claims under the ADEA or claim that cannot be released by private agreement, which were required to be brought only in individual arbitration.

39.      Facing the sudden loss of his job and a difficult job search and needing the money and health insurance, Mr. Rumsey reluctantly signed IBM's Separation Agreement.

40.    Mr. Rumsey understood IBM's Separation Agreement to allow him to file a charge of age discrimination with the EEOC and wait for the EEOC to complete its investigation and conciliation processes and issue a notice of right to sue before he was required to pursue arbitration with IBM.

41.    Under IBM's Separation Agreement, an arbitration demand is how the employee must commence arbitration: "To initiate arbitration, you must submit a written demand for arbitration to the IBM coordinator." Ex. 2 at 5. And IBM's Separation Agreement requires that this written demand must "set forth the dispute." *Id*.

42.    IBM's Agreement also requires that the arbitration demand be submitted "with a check for your payment of the filing fee made payable" to IBM. *Id*. It further states: "To initiate arbitration, you must pay the equivalent of the filing fee for the court of general jurisdiction in the state where you last worked for IBM." *Id*. As of 2016, that filing fee for Mr. Rumsey was about $195. And today it is $260.

43.    Moreover, IBM's Separation Agreement states: "The Federal Rules of Evidence shall apply." Ex. 2 at 5.

44.    Under IBM's Separation Agreement, the arbitration process functions as a mandatory substitute for the employee's "right to a court action" to resolve their ADEA claims, "including any right to a trial before a judge or jury in federal or state court. Ex. 2 at 2.

45.    IBM's Separation Agreement requires that a demand for arbitration be "promptly" filed by IBM "with the appropriate arbitration administrator," setting in motion the arbitration process. Ex. 2 at 5.

46.    IBM's arbitration agreement provides that the arbitrator's decision and award is not advisory or optional but instead is binding and enforceable in court. Ex. 2 at 5.

47.     Under IBM's Separation Agreement, an arbitration demand is substantially equivalent to filing a court complaint.

48.     Under IBM's Separation Agreement, an arbitration demand is not substantially equivalent to filing a charge with the EEOC.

49.     There has never been a filing fee for filing a charge of discrimination with the EEOC.

50.     The EEOC process is not subject to the Federal Rules of Evidence.

51.     The EEOC can request information from an employer as part of its investigation that would not be discoverable or would be very difficult to discover for an individual in a court case or arbitration. Here, for example, the EEOC was able to obtain statistical information about layoffs in other divisions of IBM beyond the one in which Mr. Rumsey worked, which helped build evidence for a case of systemic discrimination.

52.     Mr. Rumsey was not represented by a lawyer regarding his termination by IBM at any time in 2016. He was first represented in March of 2019.

53.     Nothing in IBM's Separation Agreement or the JAMS Employment Arbitration Rules requires IBM to agree to stay proceedings until the ADEA's statute of limitations—90 days after the EEOC's issuance of a Notice of Right to Sue—has elapsed.

54.     Upon information and belief, IBM has not offered or agreed to stay an arbitration of a former employee's ADEA claims until the completion of a pending EEOC investigation into a related charge of age discrimination in violation of the ADEA.

55.     Upon information and belief, IBM has vigorously opposed the stay of arbitration proceedings in other ADEA cases.

56.     In 2016, Mr. Rumsey did not know a stay of an arbitration was possible, and he could not have known whether IBM would agree to put his arbitration case on hold until after the EEOC completed its investigation and conciliation procedures in 2021.

57.     It would be especially difficult for an unrepresented employee to obtain key evidence through discovery from IBM in an arbitration proceeding. For example, IBM has refused to produce key evidence when requested in discovery requests in arbitration and court proceedings challenging its use of mass layoff to disguise its nationwide plan to replace older workers with younger workers. *See, e.g., Langley v. IBM*, No. A-18-CV-443-LY, 2019 WL 1559146, at *3 (W.D. Tex. Apr. 10, 2019):

> As should be obvious by now, IBM's conduct in discovery to date has been less than exemplary. It is on thin ice at this point. . . . The Court is also disturbed by the fact that IBM apparently has, to date, failed to produce the complete originals or other versions of the leaked documents. It is apparent to the Court that any such documents are within the scope of discovery for the claims made by Langley in this case, and the Court therefore **ORDERS** IBM to produce those documents within 20 days of the date of this order.

*See also Langley v. IBM,* No. A-18-CV-443-LY, 2019 WL 4577115, at *3 (W.D. Tex. Sept. 20, 2019) ("It is thus with a great deal of frustration that the Court is presented with yet another argument that discovery should be cabined based on an arbitrary boundary IBM created. . . . IBM has been given many opportunities to provide a reasonable means by which to define the universe of relevance for this case, and has failed each time."); *Lohnn v. IBM*, No. 21-CV-6379 (LJL), 2022 WL 36420, at *2 (S.D.N.Y. Jan. 4, 2022) (noting plaintiff's position that the arbitration agreement and its confidentiality term "have been used by IBM to prevent claimants from obtaining and using the evidence they would need to make their claims" of age discrimination relating to mass layoffs).

**II.    The EEOC Found Evidence of Systematic Age Discrimination at IBM.**

58.    In September 2020, the EEOC issued a determination that there was reasonable cause to believe that IBM discriminated against a class of thousands of laid-off IBM employees because of their age.

59.    The determination covered at least 62 charges of discrimination filed by IBM employees around the country going back to 2015, including the charge filed by Mr. Rumsey, and it looked at IBM's mass layoffs between 2013 and 2018.

60.    As described by the EEOC, its "investigation uncovered top-down messaging from [IBM]'s highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires."

61.    The EEOC analyzed data that it was able to obtain from IBM through its investigation of the charges and found that "it was primarily older workers (85.85%) in the total potential pool of those considered for layoff."

62.    The "EEOC received corroborating testimony from dozens of witnesses nationwide supporting a discriminatory animus based on age."

63.    On August 27, 2021, after a conciliation process, the EEOC issued a notice of right to sue to Mr. Rumsey and other laid-off workers who had filed charges that were not resolved in the conciliation process.

III.    **IBM's Own Documents Provide Direct Evidence of IBM's Top Leaders Disparaging Older Workers and Plotting Nationwide Efforts to Replace Them.**

64.    Powerful evidence of IBM's systemic age discrimination came to light in February 2022 in public court filings in another ADEA action, *Lohnn v. IBM,* No. 21-CV-6379 (LJL), 2022 WL 36420, (S.D.N.Y. Jan. 4, 2022), *appeal withdrawn*, No. 22-32, 2022 WL 18232089 (2d Cir. July 25, 2022).

65.    The *Lohnn* plaintiff quoted internal emails and documents in which IBM's highest executives exchanged negative stereotypes about older employees and discussed the company's sweeping efforts to replace them with younger workers.

66.    For example, one top executive expressed her desire to see an increase in the percentage of "millennial" employees at IBM. Pl.'s Statement of Material Facts ("*Lohnn* SMF"), *Lohnn v. IBM.*, No. 1:21-cv-6379 (S.D.N.Y.) (ECF No. 59) ¶ 26. This executive ruefully invoked a competitor's higher percentage of millennial workers, *Lohnn* SMF ¶ 27, and underscored the need to hire "early professionals" rather than utilize existing employees to fill jobs, *Lohnn* SMF ¶ 28.

67.    This executive's email exchanges included charts analyzing each IBM business unit's percentage of employees who were "millennial," "Gen X," "baby boomers," and "traditionalists." *Lohnn* SMF ¶ 30.

68.    Another high-level IBM executive candidly described a plan to "accelerate change" at IBM "by inviting the 'dinobabies' (new species) to leave" and to make them an "[e]xtinct species." *Lohnn* SMF ¶ 32. In another email, a top executive referenced the company's "dated maternal workforce" and said that it "must change" because they are a "real threat for us." *Lohnn* SMF ¶ 33.

16

69.    These emails also betray executives' knowledge that their plans were legally questionable at best. For instance, one email cautioned, "I'm sure you all know this but as a reminder, keep data on age very limited and when in doubt check with legal." *Lohnn* SMF ¶ 34.

70.    The evidence also shows IBM enacted policies and programs designed to reach its goal of a younger workforce. One email explains a "mandatory" rule that no "early professional hire" would be eligible for a "resource action" (*i.e.*, mass layoff) in their first year of employment, in order to make "the progress we need to make demographically." *Lohnn* SMF ¶ 35.

71.    Regarding younger employees, another email forecasted that the "math will improve" once certain resource actions were complete and "early professionals" and summer interns were onboarded. *Lohnn* SMF ¶ 36.

72.    Strategic planning documents that address hiring goals and workforce composition likewise discussed "maintain[ing] attrition" and "fund[ing] an influx of [early professionals] to correct seniority mix." *Lohnn* SMF ¶ 38. Other documents explained IBM's internal quotas for younger hires, its plan for a "10% annual talent refresh," and its "new focus on Early Professional Hires" aiming to "rebuild" and "rejuvenate" the company. *Lohnn* SMF ¶ 40.

73.    Testimonial evidence and documents also show specific actions IBM took to manufacture pretextual reasons for dismissing older employees or to otherwise sabotage their employment at the company. *Lohnn* SMF ¶¶ 56-75. In addition, expert analysis of IBM's demographic data (submitted in the *Lohnn* action) confirms that IBM workers over 50 were twice as likely to be terminated in a resource action than their younger counterparts. *Lohnn* SMF ¶ 78.

17

IV.    **Congress Amended the ADEA in 1990 to Remedy the Widespread Injustice of Older Workers Being Disproportionately Targeted for Termination in Group Layoffs.**

74.    The legislative history of the 1990 amendments to the ADEA, known as the

OWBPA, reinforces that a key purpose of those amendments was to protect older workers from

age discrimination disguised as a legitimate reduction in force:

> Group termination and reduction programs stand in stark contrast to the individual separation. . . . [E]mployees affected by these programs have little or no basis to suspect that action is being taken based on their individual characteristics. . . . Under these circumstances, the need for adequate information and access to advice before waivers are signed is especially acute. . . . [O]nce out of work, these older Americans have less than a 50/50 chance of ever finding new employment. They often have little or no savings, and may not yet be eligible for Social Security benefits. Accordingly, it is reasonable to assume that many employees would be coerced by circumstances into accepting significant compromises.

S. Rep. No. 101-263 (101st Cong., 2nd Sess. 1990) (emphasis added), reprinted in 1990

U.S.C.C.A.N. 1509, 1537-38; *see also* H.R. Rep. 101-664 (101st Congress, 2nd Sess.1990)

("The House and Senate hearing records are replete with evidence of older workers who have

been manipulated or coerced into waiving their rights under the ADEA.); S. Rep. 101-79, at 9

(1989); *Syverson v. International Business Machines Corp.*, 461 F.3d 461 F.3d 1147, 1151 (9th

Cir. 2006) (amended January 3, 2007) (citing S. Rep. No. 101-263, at 5 (1990)).

75.    To combat this pernicious use of group layoffs to coerce mass waivers and cover

up systemic age discrimination, Congress carefully crafted "a strict, unqualified statutory

stricture on waivers." *Oubre v. Entergy Operations, Inc*., 522 U.S. 422, 427 (1998). As the

Supreme Court has explained, "[t]he OWBPA sets up its own regime for assessing the effect of

ADEA waivers, **separate and apart from contract law** . . . [and] creates a series of pre-

requisites for knowing and voluntary waivers." *Id.* (emphasis added).

76.     Importantly, the OWBPA prohibits altogether the prospective waiver of any right under the ADEA, and it imposes strict requirements for waiver of any existing right under the ADEA, with heightened protections for employees laid off as a group. 29 U.S.C. § 626(f).

77.     First, when "a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees"—as the severance agreements were here—the employer must inform each worker in writing of how the group of employees selected for lay-off were chosen and "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." 29 U.S.C. § 626(f)(1)(H).

78.     Second, the OWBPA imposes requirements to ensure that laid-off workers know what rights they are waiving. For example, it requires that waivers be "written in a manner calculated to be understood by" the worker or "the average individual eligible to participate" in the agreement. 29 U.S.C. § 626(f)(1)(A).

79.     Although IBM's agreement purports to waive the ADEA's statute of limitations and statutorily mandated EEOC investigation and conciliation processes, it falls far short of meeting the OWBPA's requirements.

**V.     IBM Stops Complying with the OWBPA's Requirements While Still Obtaining Waivers of Its Workers' Collective Action Rights under the ADEA.**

80.     Between 2001 and 2013, IBM consistently provided the OWBPA-required comparator information when it included waivers of ADEA claims in severance agreements offered to employees selected for a group layoff.

81.     For example, in a 2001 group layoff, IBM "issued each selected employee a lengthy document . . . which details the job titles, ages, and numbers of those employees selected

and those not selected for termination from various IBM divisions." *Syverson*, 461 F.3d at 1149.

In each of at least a dozen group layoffs between 2001 and the end of 2013, IBM consistently

provided employees selected for layoff with the OWBPA comparator information.

82.    In 2014, however, IBM abruptly stopped its long practice of complying with the

anti-coercion requirements of the OWBPA and ceased providing the OWBPA-required

comparator information to employees it laid off. This about-face coincided with IBM's company-

wide scheme to "correct [its] seniority mix."

83.    Yet, IBM still required its laid-off workers, including Mr. Rumsey, to sign a

waiver of their statutory right to participate in and benefit from the EEOC investigation,

determination, and conciliation processes as a condition of receiving any severance payment or

health insurance benefits.

84.    In doing so, IBM sought to have its cake and eat it too: it would withhold the

information its laid-off workers needed to determine whether they had a solid factual basis to

bring ADEA claims, while at the same time prohibiting them from uncovering that information

through the EEOC's investigation and determination processes and then filing suit.

**VI.    Mr. Rumsey Filed His ADEA Claim in Arbitration Within 90 days of the
     EEOC's Notice of Right to Sue but IBM Argued It Was Untimely.**

85.    The ADEA, as amended in 1991, allows a "civil action" to be brought until "90

days **after** the date of receipt" by the person aggrieved of a notice of right to sue from the EEOC

that it has terminated its pre-suit, administrative proceedings. 29 U.S.C. § 626(e) (emphasis

added).

86.     The legislative history of the 1991 amendments confirms that "the statute of

limitations for an age discrimination action [under the ADEA] is 90 days after receipt of a notice

that a charge filed with the EEOC has been dismissed or otherwise terminated." *St. Louis v.*

*Texas Worker's Comp. Comm'n*, 65 F.3d 43, 47 & n. 17 (5th Cir. 1995) (referring to House Report No. 102–40(I), which states that the 1991 amendments to § 626(e): "makes clear that the claimant may commence a civil action at any time after 60 days from the time the charge was filed *until* the expiration of the 90 day period following receipt of notice from the Commission that it has dismissed the charge or otherwise completed its consideration of the charge, whichever is later")(quoting H.R. Rep. No. 102–40(I), 102d Cong., 1st Sess. 97, *reprinted in* 1991 U.S.C.C.A.N. 549, 635) (emphasis added).

87.     The 1991 amendments to the ADEA replaced the former Section 626(e)(1) of ADEA, which had incorporated the two-year statute of limitations for non-willful violations and three-year statute of limitations for willful violations set forth in section 6 of the Portal-to-Portal Act. *Sperling v. Hoffmann–La Roche, Inc.,* 24 F.3d 463 (3d Cir.1994) ("Under the current version of Section 626(e), effective November 21, 1991, section 6 of the Portal-to-Portal Act is no longer expressly incorporated and the statute of limitations for an age discrimination action is 90 days after receipt of a notice that "a charge filed with the [EEOC] under this chapter is dismissed or the proceedings of the [EEOC] are otherwise terminated by the [EEOC].") (citing 29 U.S.C. § 626(e) (effective Nov. 21, 1991)).

88.     On November 23, 2021, 89 days after the notice of right to sue was issued, Mr. Rumsey filed an individual arbitration demand with IBM alleging age discrimination under the ADEA.

89.     On November 23, 2021, and November 24, 2021, about 227 other IBM workers also filed individual arbitration demands with IBM. And, on November 24, 2021, a smaller group of laid-off workers who had not signed the arbitration agreement filed age discrimination claims

against IBM in court. *See Roberts v. Int'l Business Machines, Corp.*, No. 7:21-cv-09928-VB (S.D.N.Y.).

90.     After filing, the individual arbitration demands—including Mr. Rumsey's—were stayed. By agreement with IBM, Mr. Rumsey and the other arbitration claimants stayed further proceedings in their arbitrations pending the outcome of related cases against IBM in court, and then to promote an opportunity for a voluntary resolution. Either party can unilaterally terminate the stay by providing advance notice of only 30 days.

91.     When the stay of Mr. Rumsey's arbitration is terminated, his ADEA claims will proceed in individual arbitration "under the auspices of JAMS" in "the county in which [he] last worked for IBM," which is Middlesex County, Massachusetts, or "the county closest to such location." Ex. 2.

92.     After Mr. Rumsey filed the arbitration demand, IBM's counsel repeatedly argued—in writing and orally—to Mr. Rumsey's counsel that his claims, and the claims of all the other workers who filed arbitration demands in November 2021, were untimely because it read the Separation Agreement to require them to have initiated arbitration within 180 or 300 days of their notice of termination from IBM.

93.     IBM has also repeatedly taken that same position in this case, IBM's Mem. in Supp. of Mot. to Dismiss (Doc No. 15) at 18, and in other court cases and arbitration cases brought by laid-off workers, *see, e.g.*, Mem. of Law in Supp. of Mot. for Partial J. on the Pleadings as to Arbitration Opt-Ins and to Compel Arbitration, *Rusis v. Int'l Bus. Machines Corp.*, No. 18-CV-8434, 2020 WL 5512142, at *3 (S.D.N.Y. Aug. 14, 2020); *see also Rusis*, No. 18-CV-8434, ECF No. 136-6 (one of 26 arbitration decisions responding to IBM's argument that its arbitration agreement required arbitration demands be filed within same deadline as ADEA

provides for filing a charge with the EEOC, which is 300 days or less from notice of termination).

94.     IBM's position that Mr. Rumsey was required to file his arbitration demand within 300 days of his termination from IBM is based on the following provision of the Arbitration Procedure and Collective Action Waiver attached to the Separation Agreement:

> To initiate arbitration, you must submit a written demand for arbitration to the IBM Arbitration Coordinator no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim that you are making, or, if the claim is one which must first be brought before a government agency, no later than the deadline for the filing of such a claim. If the demand for arbitration is not timely submitted, the claim shall be deemed waived. The filing of a charge or complaint with a government agency or the presentation of a concern through the IBM Open Door Program shall not substitute for or extend the time for submitting a demand for arbitration.

> *See* Ex. 2 at 5.

95.     IBM contends that the second part of this provision, which requires that, if "the claim is one which must first be brought before a government agency," it be filed "no later than the deadline for filing of such a claim," refers to the deadline for filing a *charge of discrimination* with the EEOC, not the deadline for "the filing of such a claim" in court. Thus, it argues, because Mr. Rumsey did not file a demand for arbitration within the 300-day deadline for filing a charge of discrimination with the EEOC, his claims are forever time-barred.

### VII.  IBM'S 300-Day Deadline Is Invalid Because It Directly Conflicts with the ADEA's Statute of Limitations, Which Grants Plaintiffs the Right to Bring Their Claims within 90 Days after the EEOC Issues a Notice of Right to Sue.

96.     The 300-day deadline in IBM's agreement is invalid because it attempts to waive Mr. Rumsey's substantive right to file suit 90 days after the EEOC issues its notice of right to sue, and because it prevents Mr. Rumsey from effectively vindicating rights guaranteed to him under the ADEA, including, most fundamentally, the right to be free from age discrimination.

97.     The Supreme Court has held that the Federal Arbitration Act (FAA) "does not require courts to enforce contractual waivers of substantive rights and remedies." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022). Thus, "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral forum." *Id*. (quoting *Preston v. Ferrer*, 552 U.S. 346, 359 (2008) (cleaned up)); *see also id.* (explaining that "the FAA does not require courts to enforce contractual waivers of substantive rights and remedies"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985) (discussing how an arbitration clause will be enforced only "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum").

98.     Likewise, the OWBPA prohibits the prospective waiver of any right under the ADEA. 29 U.S.C. § 626(f)(1)(C). And, as described above, because IBM failed to follow the OWBPA's requirements for waiver of existing rights or claims, no waiver of a substantive right—whether prospective or not—is valid here.

99.     Here, if IBM's interpretation of the Separation Agreement is correct, Mr. Rumsey did not simply agree to resolve his claims in an arbitral forum; he agreed to a drastically shortened statute of limitations that prevents him from meaningfully participating in and benefitting from the statutory EEOC process.

100.     If IBM's interpretation of the Separation Agreement is correct, Mr. Rumsey would have been required to file his arbitration demand within 300 days of the March 2016 notice of his termination, by December 2016.

101.    But if he did not sign the Separation Agreement, he would not have been required to file his ADEA claim in court until November 2021, 90 days after the EEOC issued its notice of right to sue. *See* 29 U.S.C. § 626(e).

102.    In other words, If IBM's interpretation of the Separation Agreement is correct, its Agreement attempts to shorten the statute of limitations for Mr. Rumsey's claim by almost five years when compared to filing an identical claim in court.

103.    Because the statute of limitations under the ADEA is itself a "substantive, non-waivable right[]," *Thompson*, 985 F.3d at 521, the provision shortening the statute of limitations is void as a waiver of Mr. Rumsey's statutory rights under the ADEA. When a statute of limitations is part of the same act that creates a statutory right, it is deemed to be "an integral part of the right itself" and thus "substantive" and not "procedural." *Sarfati v. Wood Holly Assocs.*, 874 F.2d 1523, 1525-26 (11th Cir. 1989) (citations omitted); *see also Davis v. Mills,* 194 U.S. 451, 454 (1904) (Justice Holmes) ("the limitation goes to the right created, and accompanies the obligation everywhere").

104.    And even if the ADEA's statute of limitations were not itself a substantive right—which it is—shortening the deadline to file by nearly five years would prevent Mr. Rumsey from vindicating his substantive statutory rights under the ADEA to participate in and benefit from the EEOC process—and, most importantly, to seek any remedy for age discrimination at all—in at least two fundamental ways.

105.    **First**, the First Circuit and other courts have held that contractually shortened statutes of limitations of similar lengths to the one here are unenforceable because they impermissibly undermine the legislative determination "that a longer statute of limitations was

required to allow [plaintiffs] to effectuate their private cause of action under [the statute]" at issue. *Anderson*, 500 F.3d at 77.

106.    In explaining its decision in *Anderson* to strike down the contractual one-year filing deadline in a consumer arbitration agreement, the First Circuit emphasized several factors that apply with even more force here. As a threshold matter, "a statute of limitations often determines whether the consumer can seek any remedy at all. If that statute of limitations can be reduced from four years to one by agreement, the consumer loses a protection that is basic to all other consumer remedies." *Id*. Here IBM's shortened deadline would have the same draconian effect of depriving Mr. Rumsey (and many other former employees it laid off) of the basic statutory right to "seek any remedy at all."

107.    In *Anderson*, the First Circuit also emphasized that the legislature had accorded importance to the four-year statute of limitations by specifically amending the law to lengthen the statute of limitations from two years to three years to four years. *Id*. at 76-77. Likewise, here, Congress specifically amended the statute of limitations in the ADEA to ensure that workers could wait until **after** the EEOC completed its investigation and other proceedings before having to bring suit. *See also Thompson*, 985 F.3d at 519 (noting "that by requiring employees to file charges with the EEOC before involving the federal courts, Congress chose cooperation and voluntary compliance as the preferred means for eradicating workplace discrimination and established a procedure whereby the EEOC would have an opportunity to investigate individual charges of discrimination, to promote voluntary compliance with the requirements of Title VII." (cleaned up)).

108.    Moreover, the First Circuit's *Anderson* decision found significant that the statute of limitations of four years there was in the context of "statutory language emphasizing the

centrality of consumer protection" and was "part of a broader legislative scheme to remedy the imbalance which exists primarily because of a lack of parity in bargaining power between the consumer and the provider of consumer goods and services." *Anderson*, 500 F.3d at 76 (cleaned up). Here too the statutory language of the ADEA emphasizes the centrality of protecting "older workers [who] find themselves disadvantaged in their efforts to retain employment" by "arbitrary discrimination in employment because of age." 29 U.S.C. § 621(a).

109.    *Anderson* also summarily rejected the defendant's "argument that the one-year provision in the arbitration agreement merely imposes a notice obligation on customers rather than a deadline for filing claims and therefore does not conflict with the statutory time limit." *Anderson*, 500 F.3d at 75 n.8. Similar to IBM's agreement here, Comcast's agreement required consumers to "contact" them within one year of "the occurrence of the event or facts giving rise to a dispute," or else "waive the right to pursue a claim based upon such event, facts or dispute." *Id*. at 75 (capitalization omitted).

110.    Moreover, *Anderson* held that the arbitration agreement's one-year statute of limitations impermissibly conflicted with the state law's four-year statute of limitations even though the language of that state statute of limitations was limited to civil actions in court and did not expressly apply to arbitration proceedings.

111.    The four-year state law statute of limitations in *Anderson* comes from a section titled "[c]onsumer protection actions." Mass. Gen. Laws Ann. ch. 260, § 5A. That statute provides that "[a]ctions arising on account of violations of any law intended for the protection of consumers, including . . . chapter ninety-three A . . . whether for damages, penalties or other relief and brought by any person . . . shall be commenced only within four years next after the cause of action accrues." *Id.*

112.    The Plaintiff's claim in *Anderson* relied on Mass. Gen. Laws Ann. ch. 93A, § 9 ("Chapter 93A"), which is titled "[c]ivil actions and remedies; class action; demand for relief; damages; costs; exhausting administrative remedies." It describes actions in superior, district, and housing courts.

113.    In *Anderson*, the applicable statute of limitations allowed plaintiffs to pursue litigation at any time within four years of the alleged violation of their consumer rights. But this statutory right to sue at any time before the four-year deadline expired is true of most statutes of limitations. And the option of plaintiffs to file early did not, in the view of the First Circuit, change the importance of the statutory right for consumers to have up to four years before the right to sue was extinguished and the resulting need to invalidate the one-year filing deadline in the arbitration agreement.

114.    Similarly, the ADEA's statute of limitation permits workers to file suit any time after 60 days elapsed from filing a charge. *See* 29 U.S.C. § 626(d)(1). Under basic logic and the *Anderson* precedent, Congress's decision to permit early filing under the ADEA does not in any way undermine its guarantee of the longer statute of limitations based on the completion of the full EEOC investigation and conciliation process.

115.    Consistent with the *Anderson* decision of the First Circuit, the United States Court of Appeals for the Ninth Circuit recently ruled that the provision of an arbitration agreement requiring employee to file an "Alternative Dispute Resolution Request form" within one year of the date when the claim arose severely restricted an employee's ability to vindicate statutory employment rights, and thus, was substantively unconscionable under California law. *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1094 (9th Cir. August 22, 2024).

116. Similarly, the California Supreme Court recently invalidated the shortened statute of limitations in an employer's arbitration agreement with an employee because it "truncates the period the Legislature has determined employees need to effectively vindicate their rights." *Ramirez v. Charter Comms., Inc.*, 551 P.3d 520, 536 (Cal. 2024).

117. The *Ramirez* court's reasoning is directly on point here. It emphasized that the employer's shortened deadline could require employees to arbitrate their state statutory employment discrimination claims "before an administrative investigation can be conducted." *Id*. And, as the *Ramirez* court explains in terms equally applicable to the role of the EEOC under the ADEA, the "involvement of the [state civil rights agency] serves an important function and may be helpful because it requires a prompt, detailed response from the employer, giving the employee a free, quick look at the defenses the employer is likely to raise." *Id*. (cleaned up); *see also McKee v. AT&T Corp.*, 191 P.3d 845, 859 (Wash. 2008) (contract that shortened statute of limitations from four years to two years was unenforceable and against public policy because "consumers would have far less ability to vindicate their rights" (cleaned up)); *Rangone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010) (holding that a shortened statute of limitations "would significantly diminish a litigant's rights under Title VII"); *Gildea v. BLDG Mgmt.*, 2011 WL 4343464, at *4 (S.D.N.Y. Aug. 16, 2011) (explaining that "[a]rbitration contracts prevent effective vindication of rights when, for example, they . . . shorten the statute of limitations provided for by statute").

118. Although the deadline in IBM's Separation Agreement for filing an arbitration demand is the same as the deadline for filing a charge of discrimination with the EEOC, "a charge of employment discrimination is **not** the equivalent of a complaint initiating a lawsuit." *EEOC. v. Shell Oil Co*., 466 U.S. at 68 (emphasis added). Instead, the function of an EEOC

charge "is to place the EEOC on notice" so it can "then undertake[] an investigation into the complainant's allegations of discrimination." *Id.; see also EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d at 455 ("By filing a charge, an individual does not file a complaint seeking relief, but merely informs the EEOC of possible discrimination.").

119.     To initiate an EEOC investigation, a worker does not need to meet the same pleading standards that are required when filing a claim in arbitration or court. *See Graniteville Co. (Sibley Div.) v. Equal Emp. Opportunity Comm'n*, 438 F.2d 32, 38 (4th Cir. 1971) ("The purpose of [a charge] is only to initiate the EEOC investigation, not to state sufficient facts to make out a prima facie case.").

120.     Mr. Rumsey's charge of discrimination with the EEOC was only a few sentences. His charge was essentially a plea for help from the EEOC to find out the critical comparator information IBM refused to provide him: "I was not provided with any of the required OWBPA information," including "the number of employees being let go and the ages of employees being let go."

121.     Moreover, it is not necessary to be represented by counsel in the EEOC process because the EEOC acts on behalf of the employee to obtain information from the employer and investigate whether there is discrimination that meets the applicable legal standard.

122.     Arbitration, on the other hand, is adversarial, and an unrepresented employee will likely have difficulty in navigating the discovery process to obtain information and in articulating why the employer's actions were illegal under the relatively complex legal rules for proving employment discrimination.[2]

---

[2] *See, e.g.*, David Horton & Andrea Cann Chandrasekher, Employment Arbitration After the Revolution, 65 DePaul L. Rev. 457, 485 (2016); Rebecca L. Sandefur, The Impact of Counsel: An Analysis of Empirical Evidence, 9 Seattle J. for Soc. Just. 51, 73–74 (2010).

123.    "Charges are filed with the EEOC by lay-complainants who are unfamiliar with the niceties of pleading, and nearly always are without the assistance of counsel. The Commission then sets about a nonadversary investigation (in which respondents are encouraged to submit whatever evidence and arguments they regard as relevant) in an effort to determine only whether reasonable cause exists to believe that the charge is true." *Graniteville Co.*, 438 F.2d at 38-39.

124.    Because the role an EEOC charge plays in the ADEA's statutory scheme is fundamentally different from the role played by a complaint filed in arbitration or court, the requirement that Mr. Rumsey file an administrative charge with the EEOC within 300 days of the discrimination does not render the requirement that he file an arbitration demand within 300 days of the discrimination reasonable or compatible with the ADEA's statute of limitations for filing a civil action.

125.    **Second**, IBM's 300-day deadline—with no tolling or extension allowed for workers to participate in the EEOC's investigation and conciliation process—effectively deters aggrieved workers from filing charges with the EEOC or cooperating with its investigation and conciliation procedures. Thus, under binding First Circuit precedent, IBM's 300-day statute of limitations is unenforceable because it "materially interferes with communication between an employee and the EEOC" and unlawfully impairs "the Commission's ability to investigate charges of systemic discrimination." *EEOC v. Astra U.S.A., Inc*., 94 F.3d at 744 (1st Cir.) (quoting *EEOC v. Shell Oil Co*.,466 U.S. at 69).

126.    When it amended the ADEA in 1991, Congress chose to require workers to initiate the EEOC process before they could file a lawsuit, and, consistent with this decision,

established a statute of limitations for filing ADEA claims that expired 90 days *after* the EEOC

had concluded its process and issued a notice of right to sue. 29 U.S.C. § 626(e).

127.    As the Sixth Circuit explained in *Thompson*, "[t]hese provisions are part of the

substantive law of the cause of action created by the ADEA," and "[a]ltering the time limitations

surrounding these processes risks undermining the statute's uniform application and frustrating

efforts to foster employer cooperation." 985 F.3d at 521; *see also Mabry v. W. & S. Life Ins. Co.*,

2005 WL 1167002, at *5 (M.D.N.C. Apr. 19, 2005) ("This administrative scheme was carefully

crafted by Congress, and requiring a party to file suit before the EEOC has an opportunity to

review a charge would undermine and contravene the Congressionally-created scheme.").[3]

128.    IBM has repeatedly acknowledged in its own court filings that one purpose of the

ADEA's statutory framework is to facilitate the EEOC's processes for investigating and resolving

cases. *See, e.g.*, Consol. Mem. in Supp. of Def. IBM's Mot. to Dismiss and Opp'n to Pl.'s Mot.

for Summ. J., *Lohnn*, No. 1:21-cv-06379-LJL, ECF No. 26 at 18 ("The purpose of the charge-

filing requirement is to notify the EEOC so that it can 'investigat[e] claims of employment

discrimination and settl[e] disputes, if possible, in an informal, noncoercive fashion.'" (quoting

*Occidental Life Ins. Co. of California v. EEOC*, 432 U.S. 355, 368 (1977))); Corrected Br. for

Resp't-Appellee IBM, *Owens v. IBM*, No. 23-7002 (D.C. Cir. Aug. 3, 2023), Doc. No. 2010896

at 74 (acknowledging "the Sixth Circuit's concern about short-circuiting 'the pre-suit cooperative

process'—including informal methods of conciliation, conference, and persuasion—that follows

the filing of the required EEOC charge" (quoting *Thompson*, 985 F.3d at 521)).

---

[3] *See also Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 126 (2d Cir. 2010)
(noting that it was "at least possible that [the plaintiff] would be able to demonstrate" that a 90–
day limitations period in the parties' arbitration agreement was "incompatible with her ability to
pursue her Title VII claims in arbitration, and therefore void" under the Federal Arbitration Act's
"effective vindication" doctrine).

129.    IBM's interpretation of the filing deadline in its Separation Agreement thus prevents workers from vindicating their statutory rights under the scheme carefully crafted by Congress in the ADEA by requiring them to file a claim in arbitration at the same time as their deadline to file an administrative charge with the EEOC. Rather than being able to participate in and benefit from the EEOC's investigation, determination, and conciliation efforts before filing suit as Congress intended, workers are forced to immediately start litigating their claims before the EEOC investigation even begins.

130.    Here, the EEOC investigation and conciliation process took more than four years, which is typical for investigations of nationwide, systemic discrimination that are often met by resistance by the employer.

131.    "Employers often resist requests for information from EEOC seeking to obtain evidence of patterns, practices and policies claiming that production would be unduly burdensome." Message from Chair Jenny R. Yang, "Advancing Opportunity A Review of the Systemic Program of the U.S. Equal Employment Opportunity Commission" (July 7, 2016), Section IV(C), *available at* https://www.eeoc.gov/advancing-opportunity-review-systemic-program-us-equal-employment-opportunity-commission#IV.

132.    So it is very unlikely that anyone who filed an arbitration demand within 300 days of their termination would still be litigating their claim when the EEOC issued its finding that IBM had engaged in discrimination, much less completed its conciliation process.

133.    Importantly, as demonstrated by this case, a worker's statutory right to participate in the EEOC process before filing suit serves an essential role in enforcement of the ADEA: it gives workers information about evidence of discrimination that they might not otherwise have access to—the very same information that IBM denied laid-off older workers like Mr. Rumsey

when it terminated them—and a possible finding of discrimination by the EEOC that may be admissible in a future civil action in court or in arbitration.

134.    Because of the EEOC's ability to obtain the information older workers laid-off by IBM were denied, it was able to aggregate statistical data regarding the pool of workers eligible for layoff at IBM and find that older workers were statistically more likely to be laid off. But it had access to that information only as a result of its investigation into charges, including that of Mr. Rumsey, and no individual worker could have obtained that data on their own without filing a civil action.

135.    Likewise, the EEOC obtained evidence of age discrimination and corroborating testimony from dozens of workers who did not know each other and would not have been able to find the testimony or evidence on their own.

136.    And the results of the EEOC investigation also alerted workers who might not have been aware that they had age discrimination claims of the potential that their layoffs were motivated by illegal discrimination. Thanks to the ADEA's statute of limitations provision, those workers were then able to file claims based on what the EEOC investigation revealed. *See Rodriguez v. Int'l Business Machines Corp.*, 2024 WL 1313712, at *6 (S.D.N.Y. Mar. 27, 2024) (allowing claims by workers who did not sign the Separation Agreement and did not file with the EEOC to proceed against IBM because they were filed within 90 days of the EEOC notice of right to sue).

137.    The purpose of the EEOC's investigation "is to fairly and accurately assess the allegations in the charge and then make a finding."[4] And the worker may be able to use a finding

---

[4] Overview, EEOC, available at https://www.eeoc.gov/overview.

of discrimination by the EEOC as evidence to support a claim of discrimination in court or in arbitration.[5]

138.    Requiring a worker to file suit *before* the EEOC process ends eviscerates the statutory right the ADEA provides laid-off older workers to benefit from the EEOC process, including its possible finding of discrimination that could be evidence in a court or arbitration case, before deciding whether to bring suit.

139.    Without the information uncovered through the EEOC process, it would have been difficult for Mr. Rumsey to even allege a plausible claim of age discrimination or prove a prima facie case of age discrimination.

140.    Although he suspected he was laid off because of his age, Mr. Rumsey was not told the ages of the other workers who were laid off or kept on, so it would have been difficult or impossible for him to plausibly allege that he was treated differently than younger workers. And he did not have access to the information the EEOC recovered that showed discriminatory animus from the "top down" at IBM.

141.    Thus, without being able to exercise his right to participate in and benefit from the EEOC process before filing suit, Mr. Rumsey would have been unable to vindicate his rights under the ADEA.

142.    Thus, the 300-day filing deadline is also unlawful because it deprives workers of the essential benefits of an EEOC investigation into systemic age discrimination disguised by

---

[5] *See Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39 (1976) ("Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo.") (citing Fed. R. Evid. 803(8)); *Smith v. Mass. Inst. of Tech.*, 877 F.2d 1106, 1112–13 (1st Cir. 1989) (("Our canvass of the other circuits reveals general agreement that the question of admissibility [of a finding of the EEOC] is one for the discretion of the district court.").

mass layoffs and thus makes "access to the forum impracticable." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013).

143.    The EEOC process also serves another statutory purpose: ensuring that the EEOC attempts to conciliate the claims before the parties expend resources on litigation. *See* 29 U.S.C. § 626(d)(2) (EEOC "shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion"); *see also Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) ("That language is mandatory, not precatory."); *Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1094 (4th Cir. 1982) (explaining that the requirement that a worker receive a notice of right to sue from the EEOC before filing suit serves the purpose of "forestalling litigation until EEOC has had time to explore the possibility of conciliation"); *Mazurkiewicz v. Clayton Homes, Inc.*, 971 F. Supp. 2d at 689 (S.D. Tex. 2013) (rejecting defendant's argument that the plaintiff could have filed suit before receiving a notice of right to sue because it would "circumvent the congressional enforcement scheme in which the EEOC is given first crack at resolving employment disputes prior to the filing of a lawsuit").

144.    Here, the conciliation portion of the EEOC investigation began in September 2020, after the EEOC found probable cause to believe that IBM had engaged in discrimination. If Mr. Rumsey had filed in arbitration within 300 days of his termination, he would not have been able to exercise his statutory right to participate in conciliation before filing suit, and Congress's intention that the EEOC attempt conciliation before a suit is filed would be undermined.

145.    IBM opposes Mr. Rumsey's demand for arbitration based in large part on inapposite court decisions—*see* IBM's Mem. in Supp. of Mot. to Dismiss (Doc No. 15) at 1-2, 6-7 & n.2—that address challenges to the deadline in its arbitration agreement based on "the

'piggybacking rule,' a judge-made exception to the ADEA's administrative exhaustion requirements." *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 78 (2d Cir. 2023) (holding that "the piggybacking rule does not apply to arbitration and, in any event, it is not a substantive right under the ADEA"), *cert. denied sub nom. Abelar v. IBM*, 144 S. Ct. 827 (2024); *Smith v. IBM*, No. 22-11928, 2023 WL 3244583, at *5 (11th Cir. May 4, 2023) (rejecting plaintiff's argument "that the arbitrator erred in rejecting her reliance on the ADEA's 'piggybacking' rule").

146.    This complaint does not raise, much less rely on, the piggybacking rule.

147.    The court and arbitration decisions relied upon by IBM are also off point because in those cases plaintiff's counsel conceded IBM's interpretation of its murky timing provision to mean the same deadline as the administrative deadline for filing with the EEOC, *see e.g., In re IBM Arb. Agreement Litig.*, 76 F.4th at 79 (assuming that "[e]mployees who signed the Agreement had 300 days to submit written demands for arbitration"), and did not challenge the formation of that contract provision, as Mr. Rumsey does here.

148.    The 28 arbitration decisions in the public record in *Rusis v. IBM*, *see* Exs. F-GG, *Rusis*, No. 1:18-cv-08434-VEC, (S.D.N.Y. Sept. 25, 2020) (Doc No. 136-6 to 136-33) also show that Plaintiffs' counsel conceded that IBM's arbitration agreement required arbitration demands be filed within the same deadline of 180 or 300 days for filing a charge with the EEOC and did not make arguments based on ambiguities in the language of the agreement, nor argue for using the ADEA's specific statute of limitations for filing a civil action. Instead, they simply argued that running of the 300-day limitation period should be "tolled." *See* Ex. T, *Rusis*, No. 1:18-cv-08434-VEC, ECF No. 136-20 at 6 ("[T]here is no disagreement between the parties that [an ADEA claim] . . . is a claim that must first be brought before a government agency . . . .'"); *id.* at 17 ("Claimant acknowledged that his claim was not filed timely as set forth in the written

Arbitration Procedures agreed to by the parties."); Ex. V, *Rusis*, No. 1:18-cv-08434-VEC, ECF

No. 136-22 at 4 ("There is no dispute that 'the statute of limitations (deadline for filing) that the

law prescribes' is 300 days."); Ex. DD, *Rusis*, No. 1:18-cv-08434-VEC, ECF No. 136-30 at 4

("Claimant does not substantially dispute the foregoing Agreement-based arguments made by

Respondent").

149.    Despite Plaintiffs failure to make any contract interpretation or formation

arguments, two of the reported arbitration decisions nonetheless rejected IBM's timeliness

defense. Exs. FF and GG, *Rusis*, No. 1:18-cv-08434-VEC, ECF Nos. 136-32, 136-33. Among

other rationales, those decisions relied on (1) "clear federal case law holding that arbitration

agreements will be enforced only if they permit claimants to effectively enforce their statutory

rights"; (2) the JAMS Policy on Employment Arbitration Minimum Standards of Procedural

Fairness, Standard No. 1, which provides that "[a]ll remedies that would be available under the

applicable law in a court proceeding, including attorneys fees and exemplary damages, as well as

statutes of limitations, must remain available to an employee"; (3) the contract law rule that

"[a]ny ambiguity should be construed against the drafter of the agreement;" and (4) the evidence

that "[t]he IBM Arbitration Agreement has a number of somewhat inconsistent provisions. It

does, on page 27, in two separate places, state: *The Arbitrator shall apply the substantive law . . .

of . . . federal law . . . .* And, under Remedies: You and IBM agree the arbitrator(s) is authorized

to award any party the full remedies that would be available to such party if the Covered Claim

had been filed in a court of competent jurisdiction to the same extent as would a court under

applicable law." Ex. FF, *Rusis*, No. 1:18-cv-08434-VEC, ECF No. 136-32 at 2; Ex. GG, *Rusis*,

No. 1:18-cv-08434-VEC, ECF No. 136-33 at 2-3.

150.    IBM also opposes the application of the 90-day statute of limitations here because it will unfairly expose it to an indefinite statute of limitations. But the Supreme Court has squarely rejected that argument:

> The absence of inflexible time limitations on the bringing of lawsuits will not, as the company asserts, deprive defendants in Title VII civil actions of fundamental fairness or subject them to the surprise and prejudice that can result from the prosecution of stale claims. Unlike the litigant in a private action who may first learn of the cause against him upon service of the complaint, the Title VII defendant is alerted to the possibility of an enforcement suit within 10 days after a charge has been filed. This prompt notice serves, as Congress intended, to give him an opportunity to gather and preserve evidence in anticipation of a court action.

*Occidental Life Ins. Co. of California v. E.E.O.C.*, 432 U.S. at 372–73.

## VIII.    The 300-Day Deadline in IBM's Separation Agreement Is Unconscionable and thus Invalid.

151.    The alleged 300-day filing deadline in the Separation Agreement is also unconscionable under New York law.[6]

152.     The provision is procedurally unconscionable under New York law because it was presented to Mr. Rumsey and other laid-off workers on a take-it-or-leave-it basis at a time when they were faced with having just lost their jobs, and because it is worded in a way that is confusing, difficult to understand, and would not put a reasonable employee with no legal background on notice that it was shortening the statute of limitations within which to file their age discrimination claims. *See People by Abrams v. Two Wheel Corp.*, 71 N.Y.S. 2d 46, 49 (N.Y. 1988) (explaining that procedural unconscionability can include "confusing or hidden language in the written agreement"); *see also Am. Airlines v. Wolens*, 513 U.S. 219, 249 (1995) (O'Connor, J., concurring in part and dissenting in part) (procedural unconscionability not only includes "the

---

[6] IBM's Separation Agreement states as follows: "Except as otherwise noted, this Agreement will be governed by the substantive laws of New York." Ex. 2 at 3.

use of fine print and convoluted language, but a lack of understanding and inequality of bargaining power"); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 391 (E.D.N.Y. 2015) (explaining that procedural unconscionability includes questions such as, "Did one party adequately explain the content of the agreement to the other?").

153.    And courts have held that a contract that shortens the statute of limitations is substantively unconscionable when, as here, it forecloses the ability of workers to participate in and benefit from an administrative agency process that the legislature intended to help workers decide whether to pursue discrimination claims against an employer. *See, e.g.*, *Ramirez*, 2024 WL 3405593, at *21 (holding that a provision that required filing in arbitration by the deadline for filing suit with an administrative agency was substantively unconscionable because "it potentially deprives . . . employees of meaningful . . . participation" in the administrative process and "may preclude a[n] . . . investigation" by an administrative agency); *see also MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024, 1035 (N.D. Cal. 2022) (collecting cases holding that statute of limitations-shortening provisions are substantively unconscionable).

154.    IBM's timeliness provision is especially unconscionable because it lacks mutuality, and "the paramount consideration in assessing conscionability is mutuality." *Abramson v. Juniper Networks, Inc*., 9 Cal. Rptr. 3d 422, 436 (Cal. Ct. App. 2004). IBM's shortened limitations provision for claims subject to a government agency exhaustion requirement applies only to a former employee's claims and not any of IBM's potential claims against its former employees, which have the benefit of the normal statute of limitations for filing suit in court.

## IX.    No Agreement to Shorten the Deadline for Filing Was Ever Formed.

155.    Although any 300-day filing deadline is invalid and unenforceable for the reasons

40

described above, IBM cannot show that the requisites for contract formation are met here regarding the filing deadline as interpreted by IBM.

156.    Because the language in the filing deadline provision is so opaque and difficult to understand, IBM cannot show that Mr. Rumsey had adequate notice that, by signing the Separation Agreement, he was agreeing to bring any age discrimination claims in arbitration with 300 days of receiving notice of his termination. Thus, no contract as to the statute of limitations was formed. *See D3 Int'l, Inc. v. AGGF Cosmetic Grp. S.p.A.*, 2023 WL 2390552, at *7 (S.D.N.Y. Mar. 7, 2023) (under New York law, "[t]he fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract."); *166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp.*, 571 N.Y.S.2d 686, 687 (N.Y. 1991) (stating that "if an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract" (cleaned up)).

157.    As described above, IBM relies for its 300-day interpretation on a provision stating that a demand for arbitration must be filed "no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim that you are making, or, if the claim is one which must first be brought before a government agency, no later than the deadline for the filing of such a claim."

158.    In support of its 300-day interpretation of the arcane language it chose to define the filing deadline in its arbitration agreement, IBM makes a fundamentally contradictory and incoherent argument.

159.    On the one hand, it argues that "the Timeliness Provision clearly notes that the ADEA's administrative-exhaustion requirement does not apply under the Agreement." IBM's Mem. in Supp. of Mot. to Dismiss (Doc No. 15) at 6-7 (quoting its argument as adopted by the

Second Circuit in *In re IBM Arb.*, 76 F.4th at 83) (cleaned up).[7] IBM's Separation Agreement states: "The filing of a charge or complaint with a government agency or the presentation of a concern through the IBM Open Door Program shall not substitute for or extend the time for submitting a demand for arbitration." Ex. 2 at 5.

160.    On the other hand, IBM argues that, even though its Separation Agreement clearly renders the ADEA's administrative-exhaustion requirement inapplicable, its filing deadline must be interpreted as if the administrative-exhaustion requirement to file with the EEOC does apply. *See* IBM's Memorandum in support of Motion to Dismiss (Doc No. 15) at 3 ("[B]ecause Rumsey was required to file an EEOC charge within 300 days of his termination (December 2016), he was required to submit his arbitration demand within that same period").

161.    There are numerous other aspects of that provision that are contradictory or unclear, not the least of which is that, by using the word "or," the provision appears to give the worker a choice between filing within the statutory limitations period or filing within the period within which a claim must be brought with a government agency.

162.    Moreover, the agreement does not define whether "the deadline for filing of such a claim" refers to the deadline for filing an administrative charge—not usually referred to as a "claim"—or the deadline for filing that claim in court.

---

[7] *See also* IBM's Memorandum in support of Motion to Dismiss (Doc No. 15) at 8, 12 ("the ADEA's administrative-exhaustion process does *not* apply to arbitrations" and "the ADEA's exhaustion and timeliness provisions do not apply to an arbitration; they apply only to a 'civil action.'"); *see also id*. at 8 ("nothing in the ADEA's text suggests that Congress intended the ADEA's exhaustion or timeliness framework to apply in arbitrations"); Resp. Br. of Def.-Appellee IBM, *In re: IBM Arb. Agreement Litig.*, No. 22-1728 (2nd Cir. Nov. 16, 2022), (Doc. No. 92 at 55 ("[T]he EEOC's mandatory pre-suit process does not come into play in arbitration because Plaintiffs were not required to file EEOC charges before arbitrating."); Corrected Br. for Resp't-Appellee IBM, *Owens*, No. 23-7002, Doc. No. 2010896 at 74 ("[T]here is no charge requirement in the arbitration context, and thus, no mandatory pre-suit cooperative process that could be disrupted by a modified limitations period.").

163.    Indeed, arbitrators and courts have interpreted arbitration agreements that incorporate the "*applicable time periods in which to bring such claims*" as requiring a demand for arbitration be filed "within ninety days of receiving the Notice of Right to Sue" from the EEOC. *Anthony v. Affiliated Computer Servs., Inc.*, 621 F. App'x 49, 51 (2d Cir. 2015) (emphasis in original); *see also Hagan v. Katz Comms., Inc.*, 200 F. Supp. 3d 435, 444 (S.D.N.Y. Aug. 3, 2016) (upholding arbitration decision to apply 90-day from EEOC notice deadline when arbitration agreement required claims be received "within the applicable/relevant statute of limitations period"). Thus, this provision is insufficient to put workers on notice that they are agreeing to a different deadline than the deadline that would apply to their claim if they did not sign the agreement.

164.    Moreover, to have notice that they were agreeing to a 300-day deadline specifically, workers would have to have advanced state-specific legal knowledge to understand what kind of claims must "first be brought before a government agency" and the deadline for filing those claims in their particular state.

165.    This confusing language that can be understood only by someone with advanced legal knowledge is particularly insufficient to form an agreement because the OWBPA provides that a waiver of rights under the ADEA is knowing and voluntary only if it is written in language "calculated to be understood" by the laid-off worker and if it "specifically refers to rights or claims arising under this chapter." 29 U.S.C. 626(f)(1)(A)-(B). The language in the filing deadline provision here falls far short of meeting the common law standard for notice, let alone the more stringent standard under the OWBPA.

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

166.    Plaintiff repeats the allegations contained in the previous paragraphs of the First Amended Complaint as if fully alleged herein.

167.    This is an action for a declaratory judgment under 28 U.S.C. § 2201-02.

168.    An actual and justiciable controversy exists between Mr. Rumsey and IBM regarding whether Mr. Rumsey's arbitration demand is timely.

169.    IBM's alleged 300-day deadline for filing an arbitration demand is invalid because it impermissibly waives Mr. Rumsey's substantive statutory rights under the ADEA or, alternatively, prevents Mr. Rumsey from effectively vindicating his statutory rights under the ADEA.

170.    Alternatively, IBM's filing deadline provision is unconscionable because it was presented on a take-it-or-leave-it basis and written in opaque language, and because it prevents Mr. Rumsey from meaningfully participating in the EEOC's investigation of his claims.

171.    Alternatively, the filing deadline provision was never formed because it was written in contradictory and opaque language that required legal expertise to parse and failed to put Mr. Rumsey on notice that he was agreeing to a deadline different from the statute of limitations that would normally apply to his age discrimination claim under the ADEA.

172.    As a result, the filing deadline in the Separation Agreement cannot bar Mr. Rumsey's ADEA claims, which were filed in arbitration within 90 days of receiving a notice of right to sue from the EEOC, from proceeding in arbitration.

**Wherefore**, Plaintiff requests that the Court grant the following relief:

(a)    Declare that the alleged 300-day filing deadline in the Separation Agreement is invalid or unenforceable and that the applicable statute of limitations is the 90-day deadline in

the ADEA, or, alternatively, that Plaintiff's claims are timely under the terms of the Separation Agreement;

(b)    Enjoin IBM from attempting to enforce the purported 300-day filing deadline in the Separation Agreement against Plaintiff;

(c)    Award Plaintiff full costs and reasonable attorney's fees; and

(d)    Award such further relief as is deemed appropriate.

Date: November 25, 2024                    Respectfully submitted,


/s/ David G. Webbert
David G. Webbert
Deborah K. Marcuse
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
Email: dwebbert@work.law
Email: dmarcuse@work.law

/s/ Daniel H. Silverman
Daniel H. Silverman
Cohen Milstein Sellers & Toll PLLC
769 Centre St., Suite 207
Boston, MA 02130
Tel: (617) 858-1990
Email: dsilverman@cohenmilstein.com

Joseph M. Sellers
Brian Corman
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Email: jsellers@cohenmilstein.com
Email: bcorman@cohenmilstein.com

Shelby H. Leighton
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036

45

Tel: (202) 797-8600
Email: sleighton@publicjustice.net

Steven M. Tindall
Gibbs Law Group LLP
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel: (510) 350-9700
Email: smt@classlawgroup.com

**Certificate of Service**

I certify that on November 25, 2024, this document filed through the CM/ECF system will be sent electronically to all counsel of record.

Date:  November 25, 2024                    /s/ David G. Webbert
                                            David G. Webbert